UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
THE UNOFFICIAL ONSHORE  :
CREDITORS' COMMITTEE OF THE  :
BAYOU FAMILY OF COMPANIES,  :      06-cv-2379 (UA)
:
Plaintiff,  :
:
v.  :
:
BAYOU GROUP, LLC, *et al.*  :
:
Defendants.  :
---------------------------------------------------------x

### DECLARATION OF JONATHAN J. FISHER IN SUPPORT OF THE UNOFFICIAL ON-SHORE CREDITORS' COMMITTEE OF THE BAYOU FAMILY OF COMPANIES' MOTION TO APPOINT A RECEIVER

I, Jonathan J. Fisher, declare as follows:

### A.  *Qualifications and Background Regarding the Bayou Funds*

1.  I am the General Counsel and Secretary of Silver Creek Capital Management, LLC, the managing member of Silver Creek Long/Short Holdings, LLC (collectively, "Silver Creek"). I am also the representative of Silver Creek appointed to serve as Chair of the Plaintiff Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies (the "Committee"). Unless otherwise stated, the facts in this declaration are of my own personal knowledge and, if called as a witness, I could and would testify to such facts.

2.  Silver Creek is an unsecured creditor of the defendant Bayou Superfund, LLC ("Bayou Superfund"), which was one of a family of hedge funds formed and managed by defendants Samuel Israel, III ("Israel") and Bayou Management LLC. In total, Silver Creek invested $43 million in equity in the Bayou Superfund and its

predecessor, the Bayou Fund, LLC, between 2001 and 2004 in reliance on offering materials distributed by defendants Israel and Daniel Marino ("Marino"). On July 12, 2005, Silver Creek gave Bayou notice of its complete redemption from the Bayou Superfund, and, on July 28, 2005, Silver Creek received a letter dated July 27, 2006 from Israel stating that he had decided to liquidate the Bayou Funds. Subsequent communication from Bayou indicated that they would distribute the assets by mid-August 2005. Silver Creek received a check from Bayou dated August 15, 2005, but that check was returned for insufficient funds when Silver Creek attempted to deposit it. A true and correct copy of the letter dated July 27, 2005 from Bayou to Silver Creek is attached as Exhibit A. To date, Silver Creek has not received any distribution related to this notice or otherwise.

3. On August 16, 2005, a representative of Silver Creek visited the Stamford, Connecticut offices of Bayou Management LLC during normal business hours. This representative found the premises deserted and discovered an apparent suicide note written by Marino. In the note, Marino admitted that he, Israel, and others had engaged in an elaborate conspiracy to defraud Bayou investors. Silver Creek immediately notified the local police of this discovery and then notified the SEC.

B.  *The Committee's Formation.*

4. Since the discovery of Bayou's fraud, I, together with other creditors and our legal representatives, have been in contact with approximately 50 other Bayou investors, the Kroll, Inc. receiver this Court has already appointed, and the Kroll, Inc. liquidators working for the off-shore investors. From time to time, these creditors informally met to determine what actions they might jointly take to protect the interest of

creditors in general and to remedy the fraud perpetrated on investors. Ultimately, the on-shore Bayou creditors formed the Committee and structured the Committee so as to enable it potentially to serve as a successor official committee under the provisions of the Bankruptcy Code, should bankruptcy ensue.

5. Prior to the Committee's formation, Silver Creek sent notice to all creditors with whom it or other creditors had been in informal contact. The notification requested that each creditor submit a sworn statement setting forth its creditor interest in Bayou. In addition, Silver Creek requested that the United States Attorney for the Southern District of New York provide the Committee with access to Bayou creditors lists that had apparently been compiled by one or more of the defendants. The United States Attorney's office did not provide Silver Creek with access to the Bayou creditors list, but instead agreed to include notice of the Committee formation in a general notice sent to victims of the Bayou fraud. Notice was purportedly sent out on February 2, 2006 and the creditors met to form the Committee on February 7, 2006 in New York City.

6. In total, the Committee has received sworn statements of claims from 42 creditors with in excess of $109 million of unpaid investments in the on-shore Bayou Funds. The voting membership of the Committee consists of five of the largest creditors willing to serve. The voting members of the Committee hold in excess of $60 million in claims. Creditors who have not been elected to serve as voting members of the Committee may participate in Committee meetings on an *ex-officio* basis.

7. The Committee's purposes include expediting and maximizing the recovery of Bayou assets from third parties for the benefit of Bayou's defrauded

investors. Attached as Exhibit B to this declaration is a true and correct copy of the Committee's By-Laws.

### C.  Need for a Receiver.

8.  Israel has admitted raising a total of $450 million from Bayou investors. Taking account of the Arizona Attorney General's seizure of $100 million, there are approximately $350 million of unaccounted for Bayou assets. The Committee believes that the immediate appointment of a receiver with the broadest possible equitable powers is critical to mitigate the damage resulting from the Bayou fraud. The receiver's tasks should include identifying the missing and accounted for funds, prosecuting claims belonging to the Bayou estates, and recovering and distributing all remaining assets belonging to On-shore Bayou investors. To that end, the Committee has authorized the filing of the accompanying Motion seeking appointment of a receiver.

### D.  Interview and Selection of Jeffrey J. Marwil as Receiver.

9.  The Committee undertook a rigorous process to select a candidate for receiver. The Committee decided upon receiver criteria and solicited suggestions of possible candidates from Committee members and attorneys with receivership experience. Following initial screening, the Committee narrowed the field of candidates to six, and created a sub-committee to review candidate information and interview each candidate. Based on this review process, the sub-committee recommended Jeff J. Marwil, of the law firm of Jenner & Block, to the Committee. At a meeting open to both voting members and *ex officio* members, the Committee considered each of the final candidates, and unanimously approved Mr. Marwil. Attached as Exhibit C is a true and correct copy of Marwil's resume.

10.  During its vetting process, the Committee considered the rates and compensation paid to corporate fiduciaries, bankruptcy trustees, and receivers in similar

cases. To encourage effective performance and meaningful attention to the matter, the Committee believes that fair compensation should include a guaranteed base salary and an incentive based on the new money the receiver has recovered. Based on its market review and the appropriate incentive model, the Committee negotiated the proposed compensation with Mr. Mawil. The Committee believes that a base salary of $20,000 per month plus reasonable expenses is appropriate, noting that while the receiver position would not be full time, Mr. Marwil would have to devote substantial time and attention to this matter. As an incentive to maximize returns, the Committee believes a bonus of 2% of the new money that Mr. Marwil distributes to creditors is fair, provided that recovery exceeds the base salary. The Committee believes, however, that Mr. Marwil should not receive any bonus to the extent that he distributes any assets recovered by the government, through forfeiture or otherwise.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 3/28/06

_____
Jonathan J. Fisher