# EXHIBIT  A



To:     Bayou Family of Funds Members                                    July 27, 2005

From:   Sam Israel III, General Member

It is with great regret, but with an overriding sense of pride and accomplishment in a job done to the best of our abilities, that I announce the closing of the Bayou Family of Funds at the end of the July 2005. Upon completion of the final audit, all investors will receive a 100% payout on their investments. The current investors who have sent in redemption notices recently will be subject to the final audit and those redemptions will be part of the final payments. We will send updates to the investors while the audit is in progress indicating an anticipated date of final payments.

Over the nine years of Bayou's existence we have tried to always perform to the best of our abilities while managing the risk profile and to provide returns of which everyone can be proud. With the exception of what I would call "growing pains" inherent to the learning curve of business, I feel we have done an admirable job in the stewardship of the funds with which we have been entrusted and hope that you agree.

I have always been of the opinion that in order to be successful in our business one must be able to devote the majority of one's time, effort and focus on the business. At this point in time, however, I want to devote the majority of my time to my children and to my personal life. As you probably know, I am currently in the process of getting divorced. As most of you will also know, major changes like this often result in periods of self reflection, involving the examination of your life, your goals and your priorities. What has become very clear to me during this time is that the years when your children are growing from young dependent children into independent adults are extremely fleeting and precious. The opportunity to share in this miracle is not one that I plan to miss. I am in the enviable position of being able to arrange my life to make the most of this opportunity. Therefore, it is my intention to spend some time relaxing and enjoying my children and focusing on rebuilding my personal life. I will continue to trade my own and Dan's personal funds; keeping my toe in the business which I love too much to give up entirely. Additionally, when the right time comes I may well invite others to join me in this. For the immediate future, however, I hope that you will understand and respect my decision and know that it was not an easy decision to make, but that I do believe it to be the right one.

Finally, I wish to thank everyone for your support of Bayou over these nine years. We, as a team, have done our best for you, our investors, and we have certainly enjoyed working with and getting to know each of you. I realize that many of you will wish to contact me personally; however, I am asking you to please respect my desire to focus on my family and direct all communications through Bayou via info@bayougroup.com or the Investor Relations department. These communications will be forwarded to me and I will try to respond in a timely fashion.

Thank you all again. It has been my great pleasure to be associated with you all.

Sincerely,

Sam Israel III

40 Signal Road
Stamford, CT 06902
Fax: 203-487-0009
E-mail: info@bayougroup.com

General Administration: 203-708-6700
Investor Relations: 203-708-672

# EXHIBIT  B

BY-LAWS OF THE UNOFFICIAL ON-SHORE CREDITORS' COMMITTEE
OF THE BAYOU FAMILY OF COMPANIES

ARTICLE I

**Name**

This Committee shall be known as the Unofficial On-shore Creditors' Committee of the Bayou Family of Companies, and is referred to in these by-laws as "the Committee."

ARTICLE II

**Purpose**

The purpose of the Committee is to represent the interests of creditors holding unsecured claims against one or more of the on-shore entities comprising the Bayou family of companies (collectively, the "Debtor") (see Appendix 1) by facilitating the marshalling of assets of Debtor and prompt distributions to creditors.

To achieve this purpose, the Committee may engage in the following activities:

(1) Evaluate the need to seek support for and implementation of a process for judicial appointment of a receiver/trustee to marshal assets and make distributions to creditors;

(2) Evaluate prospects and make recommendation for the selection of a receiver/trustee;

(3) Monitor and work with the receiver/trustee or other fiduciary acting on behalf of the creditors to facilitate an efficient and timely forensic investigation, pursuit of claims, and, if appropriate, the commencement of a bankruptcy proceeding;

(4) Negotiate and formulate a liquidation plan to facilitate prompt distribution of Debtor's assets with an adequate reserve to finance the pursuit of additional assets, including claims of the Debtor or the Debtor's creditors; and

(5) Any other acts determined by the Committee to be reasonable or necessary to achieve the overall objective.

In its pursuit of the above-described objectives, the Committee intends, to the extent practicable and except as otherwise determined, to constitute itself in conformity with Federal Rule of Bankruptcy Procedure 2007(b) so that the Committee is well situated to be appointed as the Official Unsecured Creditors' Committee, pursuant to 11 U.S.C. §

1102(b)(1), in any case filed by or with respect to Debtor under Title 11 of the United States Code.

## ARTICLE III

### Committee Membership

(1) *Composition of Committee:* The Committee shall consist of members who are unsecured creditors of the on-shore Debtor entities. The Committee shall have two classes of members: voting members and *ex officio* members.

(2) *Appointment of Voting Members:* The Voting Members shall initially consist of the unsecured creditors that hold the seven (7) largest claims against the Debtor, and are willing to serve. The Committee may vote to appoint additional Voting Members as it sees fit.

(3) *Ex Officio Members:* The *ex officio* members, if any, of the Committee shall be those persons who desire to be members of the Committee and who have completed a Declaration of the Amount and Nature of Unsecured Claim, but who were not appointed as one of the seven Voting Members of the Committee. Except as determined by the Voting Members pursuant to these by-laws, *ex officio* members shall have all of the rights and privileges of Voting Members, but shall not be entitled to vote on any matter before the Committee. The presence or absence of an *ex officio* member shall not be considered in determining the existence of a quorum or a majority for any Committee purpose.

(4) *Representatives:* Each member shall designate a primary representative and may designate an alternative representative (provided such primary and alternative representatives are employees of, or an attorney or attorney-in-fact for, the member) and an attorney to attend and participate in Committee and subcommittee meetings, and to exercise all the member's powers. A member may change its designated representatives at will by giving written notice of any such change to the chair of the Committee, with copies to the Committee secretary and the Committee counsel.

(5) *Proxies:* A Voting Member of the Committee may, by written proxy, authorize any other Voting Member of the Committee to vote on its behalf and in its absence, with respect to any specific issue or with respect to all matters which may arise at a Committee or subcommittee meeting.

(6) *Resignation, Removal and Vacancy:* Any Voting Member may resign from the Committee at any time. A Voting Member can be removed from the Committee by a vote of the Voting Members. If a Voting Member is removed or resigns, the Voting Members may appoint a replacement. When appointed, any replacement Voting Member shall have all the rights and duties of an original Voting Member, but shall not act on any subcommittee until appointed thereto by the Chair.

## ARTICLE IV

### Officers

-2-

The officers of the Committee shall be a chair, a vice-chair and a secretary. The chair shall be the creditor with the largest net claim against Bayou; the vice-chair shall be the creditor with the second largest net claim against Bayou. The chair and vice-chair shall be the primary representatives of members of the Committee. The chair shall appoint the secretary and the secretary need not be a member of the Committee.

## ARTICLE V

**Duties of Officers**

(1) *Chair:* The chair shall:

(a) Convene timely the meetings of the Committee.

(b) Preside at the meetings of the Committee.

(c) Cause agendas to be prepared for the meetings of the Committee.

(d) Appoint appropriate subcommittees.

(e) Serve as *ex officio* member of all subcommittees to which the chair is not appointed as a member.

(f) Perform such other duties as may be delegated to the chair by the Committee which are not inconsistent with these by-laws.

(2) *Vice-Chair:* The vice-chair shall:

(a) Perform all the duties of the chair in the absence of the chair.

(b) Perform such other duties as may be delegated to the vice-chair by the Committee and are not inconsistent with these by-laws.

(3) *Secretary:* The secretary shall:

(a) Prepare and distribute in advance of each meeting an agenda for each meeting of the Committee and subcommittees.

(b) Notify members of meetings of the Committee and subcommittees.

(c) If requested by the chair, make the physical arrangements appropriate for meetings of the Committee and subcommittees.

(d) Cause attendance rosters for meetings of the Committee and subcommittees to be completed, and retain all attendance rosters.

(e) Take, transcribe, and distribute (together with a copy of the attendance roster), the minutes of each meeting of the Committee and subcommittees to the members of the Committee, to the professionals employed generally by the Committee and to such other persons as the Committee may direct.

(f) Distribute such notices and materials as directed by the chair.

(g) Perform such other duties as may be directed by the Committee and which are not inconsistent with these by-laws.

## ARTICLE VI

**Subcommittees**

(1) *Generally:* If the Committee determines that its work would be facilitated thereby, the Committee may, from time to time, establish one or more subcommittees.

(2) *Appointment:* Each subcommittee shall consist of two or more Voting Members appointed by the chair and shall be presided over by a subcommittee chair selected by the Committee chair.

(3) *Powers and Duties:* Subject only to the basic responsibilities of Voting Members of the Committee, which may not be abdicated, each subcommittee so established shall have those duties and may exercise those powers delegated by the Committee to such subcommittee.

(4) *Meetings:* Notices of, and procedures for, meetings, and requirements for quorums, shall be as provided by these by-laws or, in the absence of provision herein, as prescribed by the chair of each subcommittee. Meetings of any subcommittee may be called by the chair or any two Voting Members of the subcommittee.

## ARTICLE VII

**Meetings**

(1) *Place of Meeting:* Regular or special meetings of the Committee shall be held at any place which has been designated from time to time by the Committee chair.

(2) *Regular Meetings:* Regular meetings of the Committee may be held on not less than two (2) business days notice, at such dates, times and places as may be fixed by the Committee chair.

(3) *Special Meetings:* Special meetings of the Committee for any purpose or purposes may be called at any time by the chair or any two members of the Committee.

(4) *Notice:* Special meetings of the Committee shall be held by giving proper notice, given personally or by telephone, fax, e-mail, overnight mail or other similar means of communication. Any such notice shall be addressed or delivered to the primary representative (or in his/her absence, to the alternate representative) of each member at the address shown on the Committee roster. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means, to the recipient. Oral notice shall be deemed to be given at the time it is communicated in person or by telephone to the recipient.

(5) *Waiver of Notice:* Notice of a meeting need not be given to any member whose representative signs a waiver of notice or a written consent to the holding of the special meeting, whether before or after the meeting, or whose representative signs an approval of the minutes thereof, or attends the meeting without protesting prior thereto or at its commencement the lack of notice to such member. All such waivers, consents and approvals shall be made a part of the minutes of the special meeting.

-6-

(6) *Participation in Meetings by Conference Telephone:* Representatives of members of the Committee may participate in a meeting of the Committee, or any subcommittee thereof, through the use of a conference telephone, so long as all participants in such meeting can hear and communicate with one another.

(7) *Quorum:* Fifty percent (50%) in number of the Voting Members of the Committee, or of any subcommittee, as the case may be, present by a duly authorized representative as provided in paragraph 3 of ARTICLE III of these by-laws, constitutes a quorum of the Committee or of a subcommittee for the transaction of business at a meeting, except to adjourn as provided in paragraph (11) of this ARTICLE VII.

(8) *Voting:* Except as otherwise required by these by-laws, every act or decision of the Committee shall be made by a majority in the number of Voting Members present and voting on such matter, provided that the majority includes a majority in the amount of claims as a percentage of the total claims of the Voting Members present and voting on such matter. A meeting at which a quorum was initially present may continue to transact business notwithstanding the withdrawal or recusal of Voting Members, provided that any action taken is approved as set forth in this paragraph.

(9) *Conflict of Interest:* All Voting Members of the Committee shall disclose any conflicts of interest relating to any matter before the Committee or any subcommittee by completing a Disclosure Statement in a form approved by the Committee. If a Voting Member has a conflict of interest with respect to any proposed act or decision of the Committee or a subcommittee, said Voting Member shall recuse itself from the vote on the proposed act or decision; in the event of such a recusal, an act or decision done or made by vote of the remaining Voting Members in accordance with Article VII, paragraph 8 shall constitute an act of the Committee or subcommittee. Furthermore, any Voting Member may be excluded from discussion regarding and voting on any matter in which the Voting Member has a conflict of interest by a majority of the Voting Members.

(10) *Attendance at Meetings:* Meetings of the Committee, or of any subcommittee, shall be open to any creditor of the class whose interests are represented by the Committee, and any other party in interest (and counsel), subject to the right of the Committee to admit other persons, and subject to the right of the Committee to exclude any nonmembers from any meeting or portion thereof as to which the Committee determines that attendance by any such nonmembers and the resulting dissemination of the information to be considered or the action to be taken would be contrary to the best interests of the class or classes of creditors represented by the Committee, a breach of attorney-client privilege, or would breach any agreement, express or implied, of confidentiality with respect to the matters to be considered at such meeting.

(11) *Adjournment:* A majority of the members present by a duly authorized representative as provided in paragraph (3) of ARTICLE III of these by-laws, whether or not a quorum is present, may adjourn any meeting of the Committee or a subcommittee to another time and place. If a meeting is adjourned for less than twenty-four (24) hours, notice of the time and place of holding the adjourned meeting need not be given to absent members. If a meeting is adjourned for more than twenty-four (24) hours, reasonable notice of the time and place of holding the adjourned meeting shall be given to the members who were not present at the time of the adjournment.

(12) *No Action Without a Meeting:* No action required or permitted to be taken by the Committee or any subcommittee may be taken without a meeting at which a quorum is present when the meeting is convened unless the action is take with the written consent of all Voting Members.

(13) *Dissemination of Minutes and Other Material:* Minutes of meetings of the Committee and copies of reports and other significant written information generated or obtained by the Committee, or prepared for the Committee by its counsel or accountants, shall be provided by the secretary to all creditors of the class represented by the Committee who make written request to the secretary therefor; *provided,* however, that no such minutes or other material shall be provided if, in the judgment of the Committee, the dissemination of such minutes or other material would be contrary to the best interests of the class of creditors represented by the Committee, a breach of attorney-client privilege or would breach any agreement of confidentiality with or relating to the source or subject of any material.

(14) *Confidentiality:* Each member agrees that all information, documents or materials produced or exchanged in connection with the official activities of the Committee, and all information, documents, and materials derived from or related to such information, documents, and materials, shall be communicated in confidence for the sole purpose of conducting the official activities of the Committee by the members and their representatives and therefore shall be subject to all privileges belonging to the Committee, are not generally available to the public and shall not be revealed to third parties, which privileges may not be waived by any other party without the prior written consent of the Committee. If any member or member representative receives a subpoena or other legal process seeking production of any information designated by the Committee as confidential and/or privileged, that member shall promptly by facsimile or overnight letter notify the Committee of the request, and provide a copy of the subpoena or other process and cooperate with the Committee. The Committee shall have the burden of defending against or objecting to such request to the extent it seeks confidential information. The member receiving such request shall be entitled to comply with it only if the Committee does not seek or unsuccessfully seeks an order modifying or quashing the request for information.

## ARTICLE VIII

### Expenses Related to the Formation and Operation of the Committee

(1) *Employment of Professionals:* The Committee, acting pursuant to paragraph 7 of ARTICLE VII of these by-laws, may employ attorneys, accountants or other agents to assist the Committee or a subcommittee with the carrying on of its business under these by-laws. Any professional so employed shall not represent, during the pendency of the employment, any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the Committee shall not *per se* constitute the representation of an adverse interest. In addition, any professional employed by the Committee shall be a "disinterested person," as defined in 11 U.S.C. § 101(14).

-6-

(2) *Apportionment of Costs and Fees Incurred by Retained Professionals:* Responsibility for the payment of fees and costs incurred by any professionals employed by the Committee shall be apportioned as follows: Each Voting Member of the Committee shall be responsible for a percentage of the fees and costs incurred by employed professionals corresponding to the percentage of the total amount of Voting Member claims represented by the individual Voting Member's claim. If a Voting Member resigns or is removed from the Committee, that Member shall remain liable to the Committee for its pro rata share of the costs incurred by the Committee up to the date of resignation or removal.

(3) *Reimbursement of Expenses:* To the extent allowed by law, the Committee's expenses, including but not limited to those expenses incurred by the individual Voting Members in the formation and management of the Committee, shall be recovered from any receivership/bankruptcy estate as a priority expense.

## ARTICLE IX

### Amendment of By-Laws

These by-laws may be amended only by a vote of the Voting Members in accordance with Article VII, paragraph 8.

## ARTICLE X

### Committee Formation

The Committee shall be formed under these by-laws upon a majority vote in number and amount of claims in favor of formation of the Committee of all creditors present in person, by telephone, or by representative, who have received notice. The Committee's formation coordinator shall provide at least five days written, electronic, or oral notice to as many of the Debtor's unsecured creditors as can practicably be determined by the date of formation. Written minutes reporting the names of the creditors present or represented and voting and the amounts of their claims shall be kept and made available for inspection to appropriate persons.

# EXHIBIT C

Case 1:06-cv-02379-CM     Document 5-2     Filed 03/28/2006     Page 11 of 17

# JENNER&BLOCK

February 24, 2006

**VIA E-MAIL**

Jay Jaffe, Esq.
Baker & Daniels
600 East 96th Street
Suite 600
Indianapolis, IN 46240

Jenner & Block LLP   Chicago
One IBM Plaza        Dallas
Chicago, IL 60611-7603  New York
Tel 312 222-9350     Washington, DC
www.jenner.com

Jeff J. Marwil
Tel  312 923-2619
Fax 312 923-2719
jmarwil@jenner.com

Re:   **Bayou Management, LLC and affiliated Investment Funds (collectively, "Bayou")**

Dear Jay:

Thank you for the opportunity to submit my credentials in connection with your search to
identify a qualified and experienced professional to act as a Receiver and/or Chapter 11 Trustee
for Bayou. I believe my experience and expertise uniquely qualify me to serve in such a
position. As you are aware, I currently serve as the Securities and Exchange Commission
("SEC") selected and Federal Court appointed Receiver and Conservator of the Church
Extension of the Church of God, United Management Services and their respective subsidiaries
(collectively, "CEG"). In addition to the specific experience and expertise I have developed over
the last three and a half years as Receiver in the CEG case, I have significant complex corporate
Chapter 11 case experience. I have practiced in that area for the last 20 years representing
Chapter 11 debtors, secured and unsecured creditors, and purchasers of distressed assets. We
also currently represent the Chapter 7 Trustee in the Refco, LLC Chapter 7 case, a commodity
brokerage liquidation case, pending in the Southern District of New York, in which we have
recovered more than $800 million for the Chapter 7 estate. The scope of my experience makes
me equally comfortable in the courtroom and the boardroom. I will, if selected, use my
experience, skills of persuasion and the art of negotiation to obtain only the finest results for
Bayou's creditors.

The CEG Case

In July 2002, the SEC selected me to act as Conservator, and ultimately Receiver, for CEG in
connection with a Federal District Court action filed by the SEC against CEG and two of its
officers/directors (the "SEC Suit"). As such, I had operational and financial oversight of CEG's
wide range of businesses and financial investments and was charged with the duty to recover
more than $85 million to repay defrauded noteholder investors. Within six months of my
appointment, the Federal District Court in Indianapolis, with jurisdiction over the SEC Suit,
approved my plan for noteholder repayment (the "Plan"). Under the terms of the Plan (which
mirrors a Chapter 11 plan), we have sold and liquidated much of CEG's businesses and assets,
have investigated and pursued recoveries for fraud, fraudulent conveyance, breach of fiduciary
duties and accountant malpractice, and administered creditor claims of approximately $100
million. Currently, as CEG's Receiver, I am the plaintiff in several causes of action pending in

CHICAGO_1374450_1

Jay Jaffe, Esq.
February 24, 2006
Page 2

connection with the SEC suit.  As a result of our effective fact-finding, discovery and motion practice, we have agreed, in principal, to settle three of the more substantial and remunerative suits (breach of fiduciary duties against directors and officers, fraudulent conveyance and accountant malpractice), for amounts meaningfully exceeding available insurance, with the respective insurance companies paying policy limits in full.

My experience in CEG will translate well to an engagement in Bayou.  Similar to at least part of the case in Bayou, the basic fraudulent conduct in CEG consisted of a Ponzi scheme perpetrated on investors to buy time to recover losses on speculative and ill-conceived investments covered up by management and complicit auditors.

Chapter 11 Experience

In combination with the CEG case-specific experience in untangling investment fraud and successfully pursuing litigation recoveries to compensate investors, my experience as a Chapter 11 practitioner in complex, corporate Chapter 11 cases will prove invaluable.  I have represented dozens of companies, both public and private, in Chapter 11 reorganization cases and Chapter 11 sale cases, confirming plans of reorganization or liquidation, as applicable in all of them.  In order to accomplish these results, I have used a combination of consensus building, negotiating leverage and litigation.  I pride myself on excellent preparation, fully understanding the business, financial and legal issues involved, paying attention to the details and, most importantly, developing and implementing a strategy for success.

I am very excited about this opportunity to serve as a Receiver and/or Chapter 11 Trustee for Bayou and appreciate your consideration in that regard.  I have attached my biography and a brief outline describing some of the recent major fraud and securities litigation lawsuits in which Jenner & Block has been victorious for its clients.  In addition, should the Ad Hoc Committee of Bayou Creditors select me to serve, I would agree to immediately commence work to get fully up to speed and otherwise prepared in all respects to accept and fulfill responsibilities upon a case filing without charge to the Ad Hoc Committee, Bayou creditors or the Bayou estate.

I am available at your convenience to meet with you and other creditors to discuss my credentials, experience and ideas in connection with this matter.

Very truly yours,

Jeff J. Marwil

JJM:mmr

CHICAGO_1374450_1

*Jeff J. Marwil*

# JENNER&BLOCK



Partner
Tel: 312 923-2619
Fax: 312 923-2719
E-mail: jmarwil@jenner.com

Jeff J. Marwil is a partner in Jenner & Block's Chicago office. He is a member of the Firm's Bankruptcy, Workout and Corporate Reorganization Practice and serves on the Firm's Management Committee. Mr. Marwil is AV Peer Review Rated, Martindale-Hubbell's highest peer recognition for ethical standards and legal ability.

Having been selected by the U.S. Securities and Exchange Commission, Mr. Marwil is currently serving as the Federal court-appointed Conservator and Receiver for the Church Extension of the Church of God. In that capacity, he is administering a $100 million estate under the supervision of the Federal District Court in Indianapolis, and is pursuing fraud, breach of fiduciary duty, fraudulent conveyance and accountant malpractice lawsuits in order to repay defrauded investors.

Mr. Marwil has acted as lead counsel for middle market public and private companies, as well as syndicated loan agents, senior secured and mezzanine lenders in public and private workouts and bankruptcies. He has significant industry experience in general manufacturing, health care and related management service organizations, telecommunications, aviation and retail distribution. He has led the teams representing middle market public and private companies, as well as lenders, syndicated loan agents and constituents in many high-profile bankruptcies including Venture Lighting International, Inc. (ADLT), FV Steel and Wire Company (Keystone Steel and Wire Co.), KB Toys, Inc., Kmart Corp., UAL Corp. (United Airlines), Delta Airlines, Conseco, Inc., Level Propane Gases, Inc., BMK, Inc., Innovative Clinical Solutions (f/k/a PhyMatrix Corp.), BMJ Medical Management, Inc., Apple Orthodontix, Inc., OMNA Medical Partners, JH Collectibles, Inc., Superior Air Parts, Inc. and Andy Frain.

Mr. Marwil also represented the creditors' committee in the Keystone Steel and Wire Co. and Schwinn Bicycle Company bankruptcy cases and represented the committee of equity security holders in the bankruptcy of Zenith Electronics Corporation. He has also represented borrowers, including national retailers, distributors, technology companies and government contractors in out-of-court workouts. Mr. Marwil has acted as lead counsel for secured, unsecured and "undersecured" institutional lenders including General Electric Capital Corporation, Heller Financial, Inc., LaSalle Bank National Association, Bankers Trust, FINOVA Capital Corporation, CIT Group/Corporate Finance, and Silicon Valley Bank, among others, in workouts and bankruptcies, including projects ranging from health care borrowers and more

traditional asset-based creditors, to those involving complex and multi-layered "waterfall" project finance transactions. Another strong area of Mr. Marwil's practice is representation of venture capital concerns and their portfolio companies in connection with acquisitions and divestitures of distressed properties.

Mr. Marwil has been in the American Bankruptcy Institute, and has written articles analyzing the Internet bust, health care insolvency issues and director and officer fiduciary duties. He has spoken to various industry organizations such as the American Bar Association, the Business Bankruptcy Committee, the American Bankruptcy Institute and the Illinois CPA Society on subjects including health care insolvency, the alternatives to Chapter 11, the acquisition of distressed assets and the interrelationship between the Internal Revenue Service and the bankruptcy process.

Mr. Marwil obtained his J.D. from DePaul University College of Law, where he was a member of the *Law Review*, and his B.S. in Economics from the University of Michigan.

©Copyright 2006 Jenner & Block LLP. Jenner & Block is an Illinois Limited Liability Partnership including professional corporations.

## *Litigation & Dispute Resolution Practice*

# JENNER&BLOCK

The strength and diverse capabilities of Jenner & Block's international litigation and alternative dispute resolution practice are well known. In January of 2006, Jenner & Block placed among the top five litigation departments in the United States in *The American Lawyer* magazine's biennial "Litigation Department of the Year" award competition. The magazine singled out Jenner & Block for "astonishing" victories, "hard-fought" settlements and "extraordinary efforts" in providing pro bono services to the needy. *Lawyers Weekly USA* recently named our $1.45 billion verdict in the fraud suit against Morgan Stanley on behalf of our client Coleman (Parent) Holdings the "Top Jury Verdict" of 2005. *Corporate Counsel's* "Who Represents America's Biggest Companies" survey, listed Jenner & Block as a preferred law firm for Deere & Company, Dell Inc., The Dow Chemical Company, Exelon Corp., Honeywell International, and Sears—and we are the provider of choice for resolving disputes for many other major corporations as well. *Chambers Global* legal directory has described Jenner & Block as a firm with "bedrock strength in trial work," while reporting that our clients "...remain steadfast in their support, describing the group as 'absolutely outstanding.'"

Among our partners are 11 fellows of the prestigious American College of Trial Lawyers, over two dozen lawyers recognized as "America's Leading Lawyers" by *Chambers USA*, two former United States Attorneys, one former Chair of the ABA Section of Litigation, and numerous leaders of national, state and local bar associations. Many of our trial lawyers clerked for judges in the federal and state systems—including 11 who clerked for United States Supreme Court Justices. In addition, several of our former partners now serve as federal judges, maintaining a remarkable history of judicial service by members of the Firm. Three of our female partners were recognized by The Minority Corporate Counsel Association's publication *Diversity and The Bar* as among twenty women litigators that in-house counsel viewed as on the rise.

Our approximately 250 litigation attorneys have handled virtually every kind of litigation across a wide variety of industries including manufacturing, consumer products, energy, defense and aerospace, healthcare and pharmaceutical, financial services, and technology. We have extensive experience in areas such as antitrust, toxic exposure/environmental/mass injury, class actions, securities and derivatives, ERISA, intellectual property, representation of policyholders in insurance coverage litigation, major products liability, construction/design defect litigation, and white collar criminal defense. We have literally written the book on RICO litigation, insurance coverage litigation, liability insurance in international arbitrations, Directors and Officers liability insurance, the use of epidemiology and toxicology in tort litigation, environmental law and policy, class actions, testimonial privileges and sanctions.

We have a very active Appellate and Supreme Court Practice, which has argued 13 cases before the Supreme Court over the last five terms, including *Lawrence v. Texas*, recognized by *Legal Times* as a decision "destined to be a landmark of the decade if not the century." We successfully argued in the much publicized *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* case that file-sharing services such as Grokster and StreamCast have built their businesses on distributing illegal copies of copyrighted songs and movies, and that the software companies should be held liable for copyright infringement. We have also represented clients in matters before all 13 U.S. Courts of Appeals, in federal and state courts, and before arbitration panels and administrative tribunals throughout the country and abroad.

Our approach to litigation is based on a strong sense of ethics and an overriding focus on the long-term business needs of our clients. We approach each matter strategically, conducting early case assessments and discussing our approach with clients at the outset.

As an integral part of our litigation practice, the Firm has successfully represented clients in domestic and international mediations and arbitrations in a wide variety of subject areas, including securities, defense contracts, insurance and reinsurance, intellectual property, employment, and general commercial disputes. Early in the litigation—and not just on the eve of trial—we advise our clients about the advantages of various forms of alternative dispute resolution, including early neutral evaluation and mediation. We have achieved outstanding results for our clients in those settings. Our lawyers regularly conduct arbitrations under the rules of all major arbitral institutions, including the American Arbitration Association, the International Chamber of Commerce, the London Court of International Arbitration, and the New York Stock Exchange. In addition, several of our partners are frequently called upon to serve as mediators or arbitrators for business disputes.